Case number 20-2257-2267 Gould Electronics Inc v. Livingston County Road Commission. Oral argument not to exceed 15 minutes per side. Mr. Larson, when ready. Thank you. Good morning, Your Honors, and may it please the Court, Zach Larson on behalf of appellant Gould Electronics Inc. Before I begin, I'd like to reserve three minutes of my time for I've recently recovered from COVID. So I apologize in advance if I have a lingering cough, and I'll try not to disrupt the argument that way. Your Honors, this is this otherwise quite complicated surplus matter with a lengthy procedural history presents two relatively simple issues or principal issues on appeal. The first is that the trial court erred by failing to enforce what it previously acknowledged was a binding consent order limiting the party's claims to those that were presented in the prior 2009 case. The court improperly allowed the Road Commission to add the same circular contribution claim that it had previously rejected just seven months before, and the court did so despite the fact that the party's tolling agreement and the claims existing as of the time of dismissal of the 2009 lawsuit and required that the current pleadings in that case would be preserved as applicable and binding in any new case between the parties. The court should have enforced that agreement rather than rewriting the terms of the party's bargain. What was the it says preserved and then my understanding is that you were on the eve trial the first time around, but the second time around it doesn't seem like you guys immediately went to trial. I mean, there was a lot of stuff going on. It looked like there was discovery. There was all I mean, I'm just I'm a little confused. I mean, if the point is that you were frozen in time and that as soon as the case got revived, you should have just gone to trial, right? Why was there discovery? Why was there other stuff going on? That it is correct that you know, the language that you highlighted says that the pleadings were preserved. The record was preserved. There was an allowance for additional discovery to address the things that have happened since that point and specifically the focus would have been with respect to MDQ or Eagles review to the circumstances that had transpired between the dismissal in 2012 and 2017. So that would have been, you know, the principal focus of discovery. But nonetheless, you know, the operative language of the agreement was the current pleadings are preserved as applicable and binding and what the court recognized in that June 2019 order was that that meant the pleadings were frozen in time. It specifically said it would not allow Gould to seek salt contamination damages because that would expand the claims and it wouldn't allow LCRC to pursue its contribution claim or its divisibility defense. And oddly, that second point, the divisibility defense, the trial court stuck by that in the final opinion and said, no, that's still outside of what the parties agreed to. And we agree with that. But I think what where the court erred is that the court expanded and kind of changed from a exact limiting of the pleadings to instead trying to treat it as if it were more just a generic, you know, no prejudice to either side. Let me ask you this though. So if the pleadings are preserved, the case moves forward, there's new discovery. It was within his discretion, I take it, to allow. Are you saying that he was barred by the terms of the stipulation and the settlement agreement from allowing the claims? Or are you saying he abused his discretion by letting those, by letting the contribution claim in, but not letting the salt contamination in or whatever? Really, Judge Nalbandi, in the first of those, that this was an agreement. It was a tolling agreement. It had the blessing of the court. It was adopted in an order. And if you compare the tolling agreement to the order, you'll see that, you know, it's effectively the same language or the same operative language. And therefore, it was a consent order and should have been applied according to its terms. And so the court really did not have the discretion. But if the court did, if you assume that it did, it still abused its discretion because it ultimately shifted the ground underneath Gould just months before trial and after the close of all of that discovery. So what happened was... Once he added the claim or let them add the claim, did you ask for more prejudice? I mean, there was always kind of out there that they were going to have a claim. I understand the state had a state law contribution claim. I don't understand why they didn't have a circle one, but whatever. You kind of knew that they were going to pin it on you. What else did you need? What kind of discovery did you need and did you ask for it? Sure. And I think the question of prejudice is more really the question of, you know, it's contrary to the party's agreement. It's contrary to their expectation of what the legal positions would be and what we would be presenting when it came to the question of trial, right? Of course they had their legal position changed materially because you would have been facing that contribution claim in one form or another at some point. So why did it matter to you whether it was in this particular piece of litigation or not? Judge Gibbons, I think the court, the trial court was mistaken in saying that we could have faced that contribution claim at a later point because ultimately that would have raised all sorts of procedural questions from the standpoint of either statute of limitations, res judicata, or the underlying question of the contract. You know, I think it's important to understand that as Judge Nelbanian pointed out, that contract, the tolling agreement was signed with just three weeks before the initial trial. If the parties had proceeded, that would have made, you know, the entire matter res judicata with respect to any future claims by either party. And I think that that, given that, I think that you have to understand the tolling agreement not just as extending the ability to bring certain claims, the claims that were previously brought, but as effectively barring any other claims between the parties. I thought the cases and principles would have allowed LCRC to bring a circular claim afterwards or in a different proceeding. Are you saying that when the judge has said you can't raise this claim now, that would be res judicata on the claims that he doesn't allow to be brought now when the statute says you can bring it later? Well, so Michigan has rules with respect to res judicata that I think procedurally would be borrowed here. And obviously this wasn't an issue. It would be borrowed even in the face of the federal statute? I think that our ultimate, that Michigan's underlying res judicata principles would be adopted. And those are exceptionally broad res judicata principles that say that you have to bring any claims that you're going to bring at the time of the initial suit. And that if you don't do so, then once a judgment is entered, that that's res judicata. And so that hasn't, that particular issue hasn't been addressed in briefing. We didn't have an opportunity to address it in briefing because the way in which this arose was that the court held a status conference in early January of 2020. And immediately after that status conference asked for a very short supplemental briefing, asking two questions. One being, could the trial court equitably allocate the costs based on the current pleadings? And if not, could it allow an amendment to the pleadings? And so there was very limited briefing. I think it was 10 pages total allowed for that point. And so the question of res judicata was not raised, really did not become an issue until the court issued its own opinion, making the point that Judge Gibbons just made with respect to whether or not they could file later. But I do believe that Michigan law would have prevented that because it is a broad res judicata rule. If I can move on then, knowing my time here is limited, I'll touch on the necessary costs of response question. And really this comes down to the fact that CERCLA is intended to promote a party actually engaging in remediation. It allows recovery only of necessary costs of response. And those are supposed to be those costs that are actually addressed to the contamination. The court specifically found as a matter of fact, and we believe it correctly found as a matter of fact, that the road commission's efforts were aimed at exonerating itself from liability as opposed to mitigating the spread of contamination. That's not within the scope of recoverable costs under CERCLA. And the costs in terms of the facts that were laid out for- Let me ask you this, there's language in Keytronic that says looking for other PRPs is basically recoverable. Why wouldn't this fall under that category? Sure. And I think, Judge Nalbandian, I think two reasons. First of all, what Livingston County was doing was arguing that Gould was responsible. Gould was already addressing the contamination. There was no reason to look for or identify Gould. Gould was already actively addressing the contamination. The second would be that I think that the trial court's finding was that the county road commission's motives here were just simply defending against itself. And the end game for CERCLA has to be that you're actually attempting to remediate. And that wasn't the case here. But I think that if you drill down into- I can't remember, Carson Harbor maybe, that talks about the subjective motivations are irrelevant because everybody's going to be looking out for themselves in these situations. Do you disagree with that? Or do you want us to look at subjective motivation? No, I'm asking you to look at the trial court's finding that this is- in terms of what those activities were not intended or were not aimed at remediating. Those activities were objectively- they were putting forth response activity plans that were arguing with MDEQ as to its liability, which if you read that in context of the tolling agreement, you'll see that that was really a litigation-related attempt that the road commission later attempted to use in this litigation to obtain what I would call regulatory absolution. It wanted the MDEQ or EGLE to bless what it had done and to ultimately make a finding that it could use in litigation against Gould. I see that my time is up, but I'm happy to answer further questions. We'll hear from Mr. Burns. Thank you. Thank you. May it please the court, Paul Burns on behalf of the Livingston County Road Commission. And I want to thank the court for taking the time today. I'd like to say a couple things. First off, we believe that Judge Goldsmith, 95% of his opinion is quite frankly, unbelievably correct and well done. Judge Goldsmith, this case is over 10, maybe 14 years old, but Judge Goldsmith got the facts right and tied them down with the utmost detail. And we also agree with Judge Goldsmith. Mr. Larson made a couple arguments there. We generally agree with Judge Goldsmith's analysis in this case. And with the exception of 5%, there's only 5% of this case that we think that there are legal problems with. The error that we believe Judge Goldsmith created with regard to that 5% that he assessed to the Livingston County Road Commission is this, that once Judge Goldsmith found that the Livingston County Road Commission property was contaminated, and this is important, only through passive groundwater migration from the property, then there's no legal basis to impose any financial liability on the Road Commission. In particular, the 5% for the past and future response costs is the result of the misapplication in our opinion of the law. A way of explanation... Are you saying that he wasn't allowed to use the Gore factors and couldn't take into account what he thought was your client's dilatory conduct in terms of cooperating with the state and assisting in the cleanup? I think that he could take into effect the Gore factors, but specifically if we refer to section 9607Q subparen 1D, it indicates, and I'm paraphrasing your honor, that if the contamination on the Road Commission is only through passive groundwater migration, which is what Judge Gould found in this case, then no duty arises on behalf of the Road Commission to start a cleanup because it came from passive groundwater migration onto their property, and the statute specifically addresses that, and an EPA policy addresses that. So as a result of that, if there's no duty, the duty cannot be breached. I know Judge Goldsmith basically said that the Road Commission was foot-dragging, which was the basis for imposing the 5%, but the Road Commission spent 13 years and at $1.2 million on geological tests to determine the source of this property, this contamination. This case is highly unusual, and that's why we don't think there's a case out there. This is an opportunity, I think, for the court to clarify the defenses regarding CERCLA because this is the only case we could find where the court found one party 100% liable and the other party 0% liable for the contamination. The only reason... I thought he said that you were jointly and severally liable, but the other side was 100% responsible. I mean, doesn't he say there's joint and several liability at some point because he rejects all of the defenses, right? He rejected the third party defense and the continuous landowner, but he did find that Gould is 100% responsible for the release and that all TCA issue was released by Gould on the Gould property and that no TC was released on the Road Commission property. And what we think he missed is under 9607Q1D, that if the passive migration comes from the other property 100%, that when you apply that to the law in this case, the Road Commission should not be liable for that by percent. So you do not think that under the statute, the commission could be responsible for actions it took, which essentially the trial court viewed as impeding the cleanup? Well, that didn't happen, first of all. But let's assuming that's the basis of his finding or just the factual basis of the finding. What we're saying is that 90621D is applicable when 100% of the contamination migrates off of somebody else's property onto your property. There was no dumping in the soil on the Road Commission property. And when you apply the statute 9607, it says specifically that says that with respect to a hazardous substance from one or more sources that are not on the property of a person that is a contiguous property owner that enters groundwater beneath the property of the person solely as a result of subsurface migration in an to install groundwater remediation systems, except in accordance with the policy of the EPA. So in this particular situation, which is the zero 100% situation, no duty arises. And the fact that the Road Commission still spent a million to prove that they did not, were not the source, 9607Q1D absolves them of the duty, which they went ahead and did anyway. And so if you take the fact that 100% of the contamination came from Gould, if you just take notions of fairness, a 5% going backward and 5% going forward for something that they had no cause of and didn't do strikes the Road Commission's as notions of unfairness, but it's also part of the codification of 9607Q1D. And so... Can I ask you a question? Can I ask you a question about their arguments before your time runs out? I'm curious, because you mentioned the money that you all spent. And I am struggling a little bit with seeing how that was related to any remediation here. I mean, your friend on the other side makes a good point. I mean, you knew who the other potentially responsible party was. There were only two of you. So basically, you're just trying to exonerate yourself at that point, right? And how did it aid in the cleanup or the response? No. So what was done during the investigation was the delineation of the plume. If you take a look at the record, the theory of Gould throughout the course of this investigation over 14 years, they changed their theory of the contamination many, many times. As a result of it, the Road Commission was required to check all of that and drill their own holes and their plume. And in the end, the trial came down to the source of the plume. And Gould presented many maps with many theories that we were the source. Judge Goldsmith found that we were not the source. And so all of that data was necessary, not just to delineate the plume, to find who's at fault, but also the potential if there was a cleanup, so you knew where to put the monitoring wells. So monitoring wells were installed, soil borings were, and they were all shared and all given through requirements by the DEQ with what's called a remedial action plan. Thousands of pages of geological investigation were given so that the problem could be understood. At the same time, Gould was changing their theories of who did what, when, and they did that actually, to be honest with you, all the way through trial. And so it was all necessary, and the cases are cited, that we're entitled to that money, that $1.2 million are cited in page 23 of our brief. What did the state do after the tolling agreement went into place? What exactly was the state doing? Were they conducting their own independent investigation of where the plume went and where everything was going? Right, so what happened? Judge Gould suggested that we go back to the DEQ and have them weigh in on what was on the scientific evidence that was presented, that was ready at trial. And so we all went back, and the DEQ requested additional information, so there was additional borings, additional tests, and all that was presented by the action plan that was some 1,200 pages that was given to them to delineate the plume. And also, we had thought that Judge Gould-Smith wanted the recommendation of the DEQ because they had been studying this for some 13 or 14 years. Ultimately, the DEQ rendered an opinion that the Road Commission was not the source. Judge Gould-Smith decided, we thought that Judge Gould-Smith could have adopted that opinion. He did not. He went ahead and had the full trial, and ultimately agreed with the same conclusion that the DEQ had. And the reason this, the defenses rolled down to the innocent property owner, adjacent property owner, because of the statutory underground migration. There was no dumping in the soil on the Road Commission property. All the contamination migrated through underground water onto the Road Commission property. It seems odd to me, then, why didn't you raise a circle of contribution defense in the original case? I just think it's odd that that wouldn't have been, it seems like an obvious defense. Yes, and we had prior counsel, and when we took a look at section 9607a, the statute says any person may seek contribution from any other person who is liable either during or following any civil action under 9607. And so I think Judge Gibson asked the question, or Judge Hobbs, that we had the right to bring this even after the cause of action, so even after the trial. So what Judge Gould-Smith did, because it was a- You're saying that the following language in that statute means even after a final judgment, there's no res judicata that would bar you, correct? Correct, correct. And that's what Judge Gould-Smith, I believe, concluded. But he did bar new claims. We were gone for five years. Gould tried an assault claim. It was not allowed by the court. Judge Gould-Smith allowed new claims. So you're saying that the key difference between the divisibility argument and the assault contamination argument is that the CERCLA contribution claim, because it could have been filed later as a separate action, that made it different in kind than the other things that he did not allow? Correct. So we think he was correct. He didn't allow certain changes in claims under the tolling agreement, but he did allow the CERCLA contribution claim because it is a standalone statute, a standalone action, and is in the best interest of judicial efficiency to put it all together and get it all done at once. After all, when we went back to the DEQ, we were there for five years. And so this case has been really around at the DEQ for 14 years and Judge Gould-Smith's courtroom for six. And so he put it all together and we had the whole hearing and he made fantastic rulings, we think, in accordance with the law with exception of the five percent. And the reason, just from what we refer to as a barnyard justice, we didn't do anything. We still owe money going backwards. We still owe money going forward. And then the total expense of this is not a win for the Road Commission. It was spent in tremendous amounts of clearly the Road Commission didn't do as determined by Judge Gould-Smith and determined by the DEQ after many years, over a decade of study. So now when you get to the innocent property owner's defenses, we clearly have an innocent property owner here after two factual findings by an administrative agency with special expertise and Judge Gould-Smith after painstaking evidence. So we think that we shouldn't have to pay that going back or going forward because of all of that tied to 90622D. I know that's a mouthful. So I have any other questions? Did I reserve time for rebuttal? I think I did. All right. We'll hear from Mr. Larson then if there's nothing further. Thank you, Judge. Briefly, with respect to the third-party defense that the Road Commission has raised, as we pointed out in our brief, the due care obligation is a separate element from sole cause. And so when it comes to due care, it's appropriate to find a lack of due care as a result of delay and lack of cooperation. Specifically, the Franklin County Convention Center case found a lack of due care with just an 8 to 12-month delay. What we're looking at here with respect to the Road Commission was that they delayed between 1991, and I think the court phrased it as nearly 20 years later, before they were performing any sort of activity with respect to the property. And so certainly that's an adequate basis to find a lack of due care. The court also found a fervid resistance to the state and lack of cooperation with government as a basis for finding a lack of due care. With respect to allocation, clearly those same factors are relevant to what costs look like and whether or not a party should be held responsible for delay and arguing with the state drives up costs. In addition to that, as I think Judge Nalbanyan was getting at, is that status-based liability is in fact a part of CERCLA, and that's the underlying basis for liability. And therefore, it's an appropriate factor to look at when determining an allocation. We think, of course, that the court should have much more than a 5% allocation, but certainly the court has broad discretion. In terms of the point Mr. Burns made, that there's no other case where this has occurred that's not accurate. We cited, I think it's called the Valbruna case, which is a Northern District of Indiana District Court published case where 25% allocation was given in similar circumstances where there was an underlying finding that they did not have responsibility for the contamination. With respect to that, the Road Commission's reliance on 9607 sub Q, I believe we addressed this in our briefing, that there's language that says that subsection Q is limited to that section, so we don't think it's appropriate to be then transporting that into the third-party defenses. In terms of the costs, I think it's important to drill down into some of those costs because what you'll see is that there was very limited evidence supporting the Road Commission's costs. They were high-level summaries, and specifically, if you look at Mr. Wozlik's description of the costs, he said that Ms. Travers' costs included everything related to this case. She was their expert witness. Clearly, under the case law, expert witness fees are not appropriate to include in necessary costs of response. That included, in fact, updating those costs for the very clearly expert witness fees, but I'd ask the court to sift through those costs because, at the very minimum, we think that that should have been done by the trial court and was not, in terms of what may be recoverable versus what is obviously not. I see my time is up, so I'll happily answer any additional questions. We appreciate the argument that both of you have given, and we'll consider the case carefully.